**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ROBERT PARKER, ET AL.,**<br>    **Plaintiffs** | **CIVIL ACTION** |
| **VERSUS** | **NO.  15-2123** |
| **NGM INSURANCE COMPANY, ET AL.,**<br>    **Defendants** | **SECTION: "E" (3)** |

## ORDER AND REASONS

Before the Court are three motions *in limine*: (1) Plaintiffs' motion *in limine* to exclude the Defendants' biomechanical expert, Dr. Charles Bain, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 137 (1999);[1] (2) Defendants' motion *in limine* to exclude Plaintiffs' rebuttal biomechanical expert, Dr. David Barczyk, on the grounds that Dr. Barczyk was not timely identified as an expert witness;[2] and (3) Defendants' motion *in limine* to exclude Dr. Barczyk under Rule 702 and *Daubert*.[3]

## BACKGROUND

This personal-injury case arises from a motor-vehicle collision in New Orleans, Louisiana, on August 21, 2014.[4] On that date, Plaintiff Robert Parker was driving his 2012 Hyundai Sonata in a southerly direction on Tulane Avenue near its intersection with Interstate 10 ("I-10") in New Orleans. Also traveling southbound on Tulane Avenue at that time was Defendant Edson Rivera, who was operating a 2003 Ford E250 utility van owned and operated by his employer, Multitec, LLC. Rivera was driving directly behind Parker's vehicle. According to Parker, he began to slow down as he approached congested

---

[1] R. Doc. 64.
[2] R. Doc. 46.
[3] R. Doc. 65.
[4] The Background Section of this Order and Reasons is taken, in part, from a prior Order and Reasons. *See* R. Doc. 60 at 1.

traffic. It is undisputed that, as Parker slowed, he was rear-ended by the Ford van driven by Rivera. As a result, on May 13, 2015, Parker filed suit against Rivera, Rivera's employer Multitec, LLC, and NGM Insurance Company ("Defendants") in the Civil District Court for the Parish of Orleans, State of Louisiana.[5] The action was removed to federal court on the basis of federal diversity jurisdiction on June 16, 2015.[6] Parker alleges, due to the collision, he "sustained serious bodily injuries, including but not limited to his back, neck, head, shoulders and extremities," and seeks damages for "past and future mental anguish and physical suffering, past and future expenses for medical care, including expenses for travel to the physicians' office, loss of enjoyment of life, loss of consortium, and past and future lost earnings, along with property damage to his vehicle."[7] Parker's wife, Krista Elaine Parker, also seeks damages for "loss of consortium, services, and society of her husband."[8]

Both sides retained experts in the field of biomechanics. The Defendants retained Dr. Charles E. "Ted" Bain, while Plaintiffs retained Dr. David Barczyk. Dr. Bain and Dr. Barczyk purport to be biomechanical experts with specialized knowledge of and expertise in low-impact automobile collisions and the effect of such collisions on the human body. Dr. Bain and Dr. Barczyk are subject to motions *in limine* under *Daubert*, and Dr. Barczyk is also subject to a motion *in limine* on procedural, timeliness-of-disclosure grounds. The Court considers and decides each motion herein.

---

[5] R. Doc. 1-1.
[6] R. Doc. 1.
[7] R. Doc. 1-1 at 4.
[8] R. Doc. 1-1 at 4.

## LEGAL STANDARD

The Federal Rules of Evidence permit an expert witness with "scientific, technical or other specialized knowledge" to testify if such testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," so long as "the testimony is based upon sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case."[9] The threshold inquiry is whether the expert possesses the requisite qualifications to render an opinion on a particular subject matter.[10] If the expert's qualifications are found to be sufficient, the court then must examine whether the expert's opinions are reliable and relevant.[11] The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[12] provides the analytical framework for determining whether expert testimony is admissible under Rule 702. Under *Daubert*, courts, as "gatekeepers," are tasked with making a preliminary assessment of whether the expert's testimony is relevant and reliable.[13]

The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant.[14] The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid."[15] In *Daubert*, the Supreme Court enumerated several

---

[9] FED. R. EVID. 702.

[10] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 799 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").

[11] *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

[12] 509 U.S. 579 (1993).

[13] *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993)).

[14] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

[15] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).

non-exclusive factors that courts may consider in evaluating the reliability of expert testimony.[16] "These factors are (1) whether the expert's theory can or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[17]

The Supreme Court has cautioned that the reliability analysis must remain flexible. Various *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[18] Thus, "not every *Daubert* factor will be applicable in every situation . . . and a court has discretion to consider other factors it deems relevant."[19] In sum, the district court is offered broad latitude in making expert testimony determinations.[20]

As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility and should be left for the finder of fact.[21] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[22] The Court is not concerned with whether the opinion is correct, but whether the preponderance of the evidence establishes that the opinion is reliable. "It is the role of the adversarial system, not the court, to highlight weak evidence."[23]

---

[16] *Daubert*, 509 U.S. at 592–96.
[17] *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94).
[18] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).
[19] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004).
[20] *See, e.g., Kumho Tire*, 526 U.S. at 151–53.
[21] *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004).
[22] *Pipitone*, 288 F.3d at 250 (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted).
[23] *Primrose*, 382 F.3d at 562.

## LAW AND ANALYSIS

### I.   Dr. Charles Bain

Defendants, as the proponents of Dr. Bain's testimony, have the burden of proving by a preponderance of the evidence that Dr. Bain possesses the requisite qualifications to render opinions on the subject matter of this action and that his opinions are reliable, relevant, and admissible.[24] "With respect to qualifications, the proponent must demonstrate that the expert possesses a higher degree of knowledge, skill, experience, training, or education than an ordinary person."[25] "Additionally, the expert[']s qualifications must relate to the testimony the expert witness provides."[26] With respect to relevance and reliability, courts in the Eastern District of Louisiana have explained that, "[t]o meet this burden, a party cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required."[27]

Dr. Bain issued his expert report on April 11, 2016,[28] and the report was timely disclosed to the Plaintiffs on April 12, 2016.[29] Dr. Bain concluded in his report that Robert Parker's lower-back injuries were not caused by his being rear-ended by the vehicle driven by Edson Rivera.[30] Dr. Bain's opinion is summarized as follows:

> In summary, Mr. Parker was involved in a low speed rear-end impact followed by a very low speed frontal impact. His low back was subjected to forces that would not cause injury. Mr. Parker may have been startled by the event and experienced reflexive muscle strains. Any symptoms that he had would have abated within days without medical treatment. Any diagnoses,

---

[24] *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

[25] *Louviere v. Black & Decker U.S., Inc.*, No. 1:00CV597 (TH), 2001 WL 36385828, at *1 (E.D. Tex. Oct. 26, 2001) (citing FED. R. EVID. 702).

[26] *Jimenez v. United States*, No. SA-5:13-CV-096-OLG, 2014 WL 3907773, at *1 (W.D. Tex. July 25, 2014).

[27] *See, e.g., Martinez v. Offshore Specialty Fabricators, Inc.*, No. 08-4224, 2011 WL 820313, at *2 (E.D. La. Mar. 2, 2011).

[28] R. Doc. 70-2.

[29] *See generally* R. Doc. 39.

[30] R. Doc. 70-2 at 12.

and subsequent investigations and treatments related to DDD, are not causally related to the subject event.[31]

Plaintiffs argue Dr. Bain should be precluded from offering expert testimony in this case because he is unqualified and because his proposed testimony does not satisfy the requirements of *Daubert*. Dr. Bain's qualifications and the relevance and reliability of his opinions are best analyzed in two stages—(1) Dr. Bain's collision analysis, and (2) Dr. Bain's medical-causation analysis.

### 1.  *Collision Analysis*

According to Dr. Bain, he established the velocity of the vehicles in the crash by determining the force necessary to cause the observed damage to the car and van involved.  As he puts it, he analyzed the rear-end collision "to characterize the necessary force to cause damage to the component parts of the vehicle."[32] Based on the velocities of the vehicles, Dr. Bain expressed an opinion that the load experienced by Robert Parker in the crash must have been less than 250 pounds. Dr. Bain did not go to the accident scene, did not inspect the vehicles, and did not speak to anyone who repaired the vehicles. Instead, he viewed still photographs of the 2012 Hyundai Sonata after the collision and reviewed repair estimates for that same car.[33] He failed to even review photographs of or repair estimates for the Ford Econoline van.[34]

The Court first examines Dr. Bain's qualifications to render this expert opinion. The Court will then examine the methodology employed by Dr. Bain and the facts and data underlying his conclusions.

---

[31] R. Doc. 70-2 at 12.
[32] R. Doc. 70-2 at 5.
[33] R. Doc. 70-1 at 8-9.
[34] R. Doc. 70-2 at 3.

### a.  Qualifications

Dr. Bain earned an undergraduate degree in nuclear engineering from the Royal Military College in Kingston, Ontario, in 1974.[35] Dr. Bain represents that, in pursuit of his undergraduate degree, he took one-time courses titled: "Waves and Quantum Physics; Physical Metallurgy; Mechanics of Materials; Nuclear Science; Mass Transfer Operations; and Applied Thermodynamics."[36] His 40-year-old degree in nuclear engineering is the extent of Dr. Bain's formal engineering training. Dr. Bain does not hold a degree in biomechanics or biomechanical engineering. Dr. Bain is not a registered or licensed engineer, and he has never worked as an engineer.

For a total of three weeks in 2003, Dr. Bain took two accident-reconstruction courses at Northwestern University, and in 2006, Dr. Bain became certified in accident reconstruction by the Accreditation Commission for Traffic Accident Reconstruction (ACTAR).[37] Defendants have not presented any information or evidence to the Court with respect to (1) the nature of the coursework taken and how it relates to the facts in this case, or (2) the requirements to obtain a certification in accident reconstruction from ACTAR. The Defendants have not explained how Dr. Bain's accident reconstruction courses qualify him to give the opinions he has expressed in this case.

According to Dr. Bain, he has consulted "in the scientific disciplines of vehicle dynamics (impact analysis), occupant kinematics, biomechanics, [and] injury potential and medical analysis" since 2003.[38]  He also has consulted with respect to a combined process he refers to as an "Injury Causation Analysis (ICA)."[39]

---

[35] R. Docs. 70-7 at 2, 70-8 at 2.
[36] R. Doc. 70-8 at 2.
[37] R. Doc. 70-8 at 2; R. Doc. 70-7 at 2; R. Doc. 70-1 at 26–27.
[38] R. Doc. 70-2 at 2.
[39] R. Doc. 70-2 at 2.

Based on (1) Dr. Bain's undergraduate engineering degree, (2) the three-week accident reconstruction course, (2) Dr. Bain's ACTAR certification, and (3) his work as a forensic consultant, the Defendants contend Dr. Bain is qualified to testify as an expert in this case with regard to the rear-end collision.  Because an expert need only possess a higher degree of knowledge, skill, experience, training, or education than an ordinary person in the subject matter of his testimony, the Court finds that the Defendants have established the minimal qualifications needed to qualify Dr. Bain to testify as an expert with respect to his collision analysis.

b.  <u>Reliable Principles & Methods</u>

The Court must now determine whether Dr. Bain's opinions are relevant and reliable. Dr. Bain analyzed the vehicles' velocities immediately prior to the collision, their pre-collision accelerations, the impact-related changes in the vehicles' velocities as a result of the collision (delta-v),[40] and the closing velocity of the Ford Econoline van driven by Edson Rivera. Dr. Bain opined, specifically, that the delta-v of the Ford van was 3.6 mph, the delta-v of Robert Parker's Hyundai was 5.7 mph, the Ford's peak acceleration was 3.6 g, and the Hyundai's peak acceleration was 5.6 g.[41] The Ford's closing velocity, according to Dr. Bain, was 6.5 mph.[42] Dr. Bain then concluded that "compressive lumbar loads in frontal crashes for delta-vs less than 15 mph are typically less than 250 lbs."[43] Because he found the delta-vs in this collision to be less than 15 mph, Dr. Bain opines that Robert Parker experienced loads of less than 250 pounds in the crash.  As discussed in

---

[40] Simply stated, delta-v is the change in velocity between pre-collision and post-collision trajectories of a vehicle.
[41] R. Doc. 70-2 at 7.
[42] R. Doc. 70-2 at 7.
[43] R. Doc. 70-2 at 10.

the medical causation section below, he then opined that this collision could not have caused Robert Parker injury.[44]

The exact velocities of the vehicles at the time of the crash is unknown, although the individuals involved agreed that they were not travelling at a high rate of speed. The force or load exerted on Robert Parker as a result of the crash also is unknown. To determine the velocity of the vehicles and the resulting force or load, Dr. Bain relied on his quasi-static force deflection loading test. The purpose of this test, according to Dr. Bain, was "to replicate or exceed the degree of damage observed in the subject vehicles from the incident crash and quantify the necessary force required to create a similar pattern of damage."[45] Dr. Bain represents that he obtained a "complete front bumper system" for a Ford Econoline 250 van and an "undamaged rear clip of an exemplar Hyundai," mounted those components in a "hydraulic bumper test machine," and used the machine to push the components together "in horizontal motion until [the] damage exceeded that of the subject Hyundai."[46] According to Dr. Bain, this test generated a "bumper to bumper force profile," which he then incorporated into a "collision simulation model using an impact mechanics-based numerical algorithm."[47] This algorithm generated the speed, acceleration, and delta-v figures that serve as the basis of Dr. Bain's conclusions in this matter.

Dr. Bain testified in his deposition that his quasi-static force deflection loading test uses a quasi-static test to replicate what was is in reality a dynamic event, an accident involving two moving vehicles.[48] Dr. Bain admitted that the validity of his opinion is

---

[44] R. Doc. 70-2 at 12.
[45] R. Doc. 70-2 at 5.
[46] R. Doc. 70-2 at 5–6.
[47] R. Doc. 70-2 at 4–6.
[48] R. Doc. 70-1 at 42.

dependent upon his proving "that the quasi static compression as well as the compression from the dynamic crash test were not rate dependent; the differences in time did not show any rate dependence, and we proved that in our initial study."[49] In other words, for his methodology to be scientifically valid, it must be shown that his quasi-static force deflection test successfully predicts the velocities and force in a dynamic collision. This determination must be based upon factors such as whether his theory can or has been tested, whether his theory has been subject to peer review and publication, the known or potential rate of error of his technique or theory when applied, the existence and maintenance of standards and controls, and he degree to which the technique or theory has been generally accepted in the scientific community.

Dr. Bain relies on four articles to support the reliability of his premise that conducting a quasi-static force deflection loading test will reliably quantify the pre-collision velocities and accelerations of the vehicles involved in a dynamic collision and, in turn, allow him to "quantify the necessary force required to create a similar pattern of damage."[50] These articles are: (1) Scott, et al., *Simulation Model for Low-Speed Bumper-to-Bumper Crashes* (2010); (2) Scott, et al., *Reconstruction of Low-Speed Crashes Using the Quasi-Static Force vs. Deformation Characteristics of the Bumpers Involved in the Crashes* (2012); (3) Funk, et al., *Comparison of Quasistatic Bumper Testing and Dynamic Full Vehicle Testing for Reconstructing Low Speed Collisions* (2014); and (4) Bonugli, et al., *Characterization of Force Deflection Properties for Vehicular Bumper-to-Bumper Interactions* (2014).

---

[49] R. Doc. 70-1 at 50.  It is not clear what "initial study" Dr. Bain references. If it the first Scott article, the Court was unable to find any statement to this effect in the paper.
[50] R. Doc. 70-2 at 5.

The first article cited by Dr. Bain—Scott, et al., *Simulation Model for Low-Speed Bumper-to-Bumper Crashes* (2010)—describes a study the authors ("Scott") conducted of "collinear" low-speed bumper-to-bumper crashes.[51] Initially, it should be noted that Scott performed only three low-speed quasi-static tests, likely an inadequate study size. The stated purpose of the study was to develop an analytical model for use in performing "parametric studies" of low-speed crashes. Scott replicated a collinear, *i.e.*, straight-line, collision in a controlled environment, where the midpoint of the trailing vehicle's front bumper impacted the midpoint of the lead vehicle's rear bumper.[52] Scott purports only to develop a method for reconstructing low speed collisions based on quasi-static testing of bumpers systems and says nothing about the application of his results to dynamic crashes. Scott does not claim that his quasi-static testing of bumper systems has been proven to be applicable in evaluating dynamic crashes. Scott assumes the vehicles being tested are rigid bodies with all of the compliance (force) contained in the bumper system.[53] Interestingly, the authors of the third study cited by Dr. Bain point out the deficiencies in using the Scott article for the purpose of determining velocity and force in collisions such as the one that occurred in this case because real world collisions are dynamic and involve full vehicles, not just bumper systems. These deficiencies are illustrated by the significant differences between the analytical model developed and tested by Scott and the facts of this case:

> (1) The testing done by Scott was collinear.  The collision in which the Plaintiff was injured was not collinear.[54] Dr. Bain did not attempt to replicate a collinear collision when he conducted his quasi-static force deflection loading test.[55] Instead, Dr. Bain stated in his deposition that he used "the entire rear of a Hyundai Sonata" and "the front bumper from the Ford van" and "compressed

---

[51] R. Doc. 70-13 at 2.
[52] R. Doc. 70-13 at 2.
[53] R. Doc. 70-15 at 2-3.
[54] R. Doc. 70-1 at 25.
[55] R. Doc. 70-1 at 41.

them together . . . in the exact alignment that happened here,"[56] referring to the alignment of the vehicles in the instant rear-end collision, which was, according to Dr. Bain, a "lateral offset" of "almost 50 percent."[57]

(2) Scott used the components of two vehicles that were "modified for low-speed bumper-to-bumper impacts": (1) a 2007 Ford Edge, and (2) a 2007 Kia Sportage.[58] Scott describes in detail the components of the vehicles, the modifications he made for testing purposes, and the method of attachment to the testing apparatus.[59] Dr. Bain, on the other hand, merely states that he used the entire rear section of a 2014 Hyundai Sonata and the front bumper from a Ford van "mounted on a hydraulic bumper test machine."[60] Dr. Bain failed to establish that he used comparable vehicle components or that he mounted the vehicles for testing purposes in the same manner used by Scott.

(3) Scott "assumes that the vehicle bodies are rigid structures and the only part of the vehicles that deform are the bumper systems."[61] The damage in the collision in this case was more extensive than just bumper deformities. In fact, repair estimates for Parker's Hyundai stated the need to replace the rear bumper cover, the rear energy absorber, and the right bumper bracket. Furthermore, Dr. Bain reports that the right quarter panel and the rear body panel required repair.[62]

(4) Scott states that the Ford Edge and Kia Sportage bumpers he tested each have "the same structural characteristics."[63] Dr. Bain does not establish that the Hyundai Sonata and the 2003 Ford Econoline 250 van bumpers involved in the collision and used in his test have the same structural characteristics. In fact, it is unlikely those bumpers, which are from substantially different vehicles and were manufactured approximately nine years apart, have the same structural characteristics.

(5) Scott conducted three low-speed bumper-to-bumper crash tests with a Kia Sportage and a 2007 Ford Edge.[64] The vehicles used by Dr. Bain were a 2012 Hyundai 4-door sedan and a 2003 Ford Econoline 250 van. Dr. Bain fails to account for the differences in the vehicles involved in this crash, such as the complete extent of the damage to the vehicles; the size and weight of the vehicles; the height of their bumpers in relation to each other; road conditions; the construction and crush resistance of their bumpers; and whether either of the bumpers had any pre-existing damage.

---

[56] R. Doc. 70-1 at 41.
[57] R. Doc. 70-1 at 25.
[58] R. Doc. 70-13 at 5.
[59] R. Doc. 70-13 at 5.
[60] R. Doc. 70-2 at 5.
[61] R. Doc. 70-13 at 4.
[62] R. Doc. 70-2 at 4–5.
[63] R. Doc. 70-13 at 5.
[64] R. Doc. 70-13 at 5.

(6) The vehicles used by Scott had piston-type energy absorbers.[65] Dr. Bain does not identify the type of energy absorbers in the bumpers involved in this case.

The second article cited by Dr. Bain—Scott, et al., *Reconstruction of Low-Speed Crashes Using the Quasi-Static Force vs. Deformation Characteristics of the Bumpers Involved in the Crashes* (2012)—does compare the results of quasi-static testing with the results of dynamic testing. However, the dynamic testing done by Scott was with the front, or target, vehicle stationary pre-crash; both vehicles in this case were moving at the time of the collision.  Further, only three quasi-static tests and three dynamic tests were done, likely an inadequate study size. Scott does not state that the quasi-static testing he did with a stationary front car is applicable to dynamic collisions in which both vehicles are moving at the time of the crash. As with the first Scott article, the deficiencies in making this argument are illustrated by the significant differences between the analytical model developed and tested by Scott and the facts of this case:

(1) In this article, Scott again examined *collinear* low-impact rear-end collisions where "the centers of the bumpers were in line,"[66] unlike the collision in this case which involved a fifty percent lateral offset.[67]

(2) The target vehicles in the Scott tests were stationary while the target vehicle in this case was moving.

(3) Scott further explained, similar to the tests conducted in the first article, that "the only structures that underwent measurable deformation were the bumpers."[68] The damage in the collision in this case was more extensive than just bumper deformities. In fact, repair estimates for Parker's Hyundai stated the need to replace the rear bumper cover, the rear energy absorber, and the right bumper bracket.  Furthermore, Dr. Bain reports that the right quarter panel and the rear body panel required repair.[69]

(4) Scott used bumper systems from six different vehicles, including (1) a 1994 Toyota Tercel, (2) a 2003 Chevrolet Express van, (3) a 2002 Honda Civic, (4) a

---

[65] R. Doc. 70-13 at 16.
[66] R. Doc. 70-14 at 3.
[67] R. Doc. 70-2 at 4.
[68] R. Doc. 70-14 at 4.
[69] R. Doc. 70-2 at 4–5.

2007 Ford Escape, (5) a 2008 Honda Civic, and (6) a 2005 Kia Sedona.[70] As explained above, however, the vehicles used by Dr. Bain were a 2012 Hyundai 4-door sedan and a 2003 Ford Econoline 250 van.  Dr. Bain fails to account for the differences in these vehicles, such as the complete extent of the damage to the vehicles; the size and weight of the vehicles; the height of their bumpers in relation to each other; road conditions; the construction and crush resistance of their bumpers; and whether either of the bumpers had any pre-existing damage.

(5) It is also clear that Scott's bumper systems were modified significantly for the exemplar crash tests.[71] Dr. Bain, on the other hand, merely states that he used the entire rear section of a 2014 Hyundai Sonata and the front bumper from a Ford van "mounted on a hydraulic bumper test machine."[72] Dr. Bain failed to establish that he used the same components or mounted the vehicle components for testing purposes in the same manner used by Scott.

(6) With respect to the actual device used by Scott in conducting the crash tests, Scott stated a "device was built that quasi-statically crushes the two bumpers into each other while they are in the proper relative orientation."[73] In this case, Dr. Bain used a "hydraulic bumper test machine."[74] The Defendants have not established that Dr. Bain's machine is the same as Scott's device.

The third article cited by Dr. Bain—Funk, et al., *Comparison of Quasistatic Bumper Testing and Dynamic Full Vehicle Testing for Reconstructing Low Speed Collisions* (2014) —attempts to deal with the deficiencies of the methodology used in the first two Scott articles.[75] The authors ("Funk") investigated the accuracy of quasi-static bumper testing and dynamic full vehicle testing for purposes of low speed accident reconstruction. Funk matched quasi-static bumper testing and full vehicle dynamic testing. Funk performed 22 tests on only seven different vehicle pairs,[76] likely an inadequate study size. To compound this problem, not all of the pairs tested yielded usable results. The authors could say only that "[s]everal of the cases studied

---

[70] R. Doc. 70-14 at 3.
[71] R. Doc. 70-14 at 4.
[72] R. Doc. 70-2 at 5.
[73] R. Doc. 70-14 at 2.
[74] R. Doc. 70-2 at 6.
[75] R. Doc. 70-15 at 3.
[76] R. Doc. 70-15 at 3.

demonstrated good matches in terms of both vehicle damage and mechanical response."[77] As with the second Scott article, the front vehicle in the Funk study was stationary prior to impact, while both vehicles in this case were moving at the time of the collision. Except for case 7, there was full overlap between the bumpers with less than 1 foot of offset between the centerline of the vehicles,[78] while in this case there was a 50 percent overlap. Funk reported no cases in which one bumper overrode the other, but this may well have been the case with the Hyundai Sonata sedan and the Ford Econoline van.[79] Importantly, Funk concludes that "quasistatic bumper testing is a reliable method for reconstructing low speed collisions, provided that the test accurately reproduces the vehicle damage that occurred in the real world collision."[80] Funk assumed damage only to the bumpers of the cars tested, but, as noted earlier, the damage to the Hyundai Sonata was more extensive than just the bumper.

The fourth article cited by Dr. Bain is Bonugli, et al., *Characterization of Force Deflection Properties for Vehicular Bumper-to-Bumper Interactions* (2014). Dr. Bain describes this paper as a compilation of the "hundred or so tests that we've done by 2013, looking at the different characteristics of different types of vehicles, different classes of vehicles interacting with each other."[81] Bonugli compiled the results of the quasi-static tests done by Biodynamic Research Corporation to "investigate the behavior of road vehicle bumper systems," testing "various bumper-to-bumper alignments" and "various combinations of vehicle categories." Bonugli states the validation for this article is described in the Scott articles,[82] which the Court has already analyzed above. Bonugli

---

[77] R. Doc. 70-15 at 7.
[78] R. Doc. 70-15 at 3.
[79] Id.
[80] R. doc. 70-15 at 10.
[81] R. Doc 70-1 at 42. By "we," Dr. Bain is referring to Biodynamic Research Corporation.
[82] R. Doc. 94-1 at 2.

categorized each test by "vehicle type, vertical bumper alignment, horizontal bumper alignment, and whether or not the struck vehicle was equipped with a trailer hitch ball mount."[83] This is a recognition by Bonugli that quasi-dynamic testing will be affected by these variables. Unfortunately for Dr. Bain, none of the test categories used by Bonugli matches the Hyundai Sonata sedan and the Ford Econoline E250 van involved in this case. The closest comparison is the "heavy vehicle-to-car with full overlap" category,[84] but material distinctions exist. The collision in this case involved a 50 percent lateral overlap. Equally as important, the Court takes judicial notice that a Ford Econoline 250 van is smaller than the defined heavy vehicle as it does not have a weight of 10,000 pounds or more.

Troubling to the Court is the fact that all four studies cited by Dr. Bain are by employees of Biodynamic Research Corporation, the corporation by which he is employed and is a part owner. Dr. Bain has conceded that he has published no peer-reviewed articles describing his methodology and his conclusion that his quasi-static force deflection loading test can predict velocities and loads in dynamic crashes.[85] Dr. Bain admits the only members of his profession who have "reviewed" his testing methodology are his co-workers at Biodynamic Research Corporation, a for-profit entity actively engaged in consulting for litigation purposes.[86] This is hardly proof that Dr. Bain's methodology is generally accepted by the scientific community. Dr. Bain's report provides only his conclusions and cursory citations to the articles he claims support his conclusions, giving

---

[83] R. Doc. 94-1 at 3.

[84] R. Doc. 94-1 at 5. The heavy vehicle is defined as vehicles with a gross vehicle resting weight of 10,000 pounds or greater.

[85] R. Doc. 70-1 at 14–15.

[86] R. Doc. 70-1 at 16, 27. In their opposition to the motion *in limine*, Defendants argue that the papers on which Dr. Bain relies have been peer-reviewed. While this may be so, this does mean that Dr. Bain's methodology has been peer-reviewed.

little insight into his intermediate analysis, how he applied his methodology, or how his methodology is supported by the four articles he cites.[87] In his deposition Dr. Bain did little to explain the methodology he used or the support provided by the cited articles. With respect to relevance and reliability, courts in the Eastern District of Louisiana have explained that, "[t]o meet this burden, a party cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required."[88] This, the Defendants have failed to provide.

To be admissible, expert testimony must be the product of reliable principles and methods.[89] After assessing the reliability of Dr. Bain's proffered expert testimony with respect to the velocities and force experienced in the crash, the Court finds that it does not meet the standards of Federal Rule of Evidence 702 and *Daubert*. Defendants have not met their burden of establishing that Dr. Bain's proposed testimony is the product of reliable principles and methods. It has not been shown that his technique or theory is generally accepted in the scientific community, or that his methodology has been peer reviewed. Dr. Bain has failed to account for many factors that would affect velocity and force in a dynamic crash, such as: the complete extent of the damage to the vehicles; the size and weight of the vehicles; the heights of their bumpers in relation to each other; road conditions; the construction and crush resistance of their bumpers; whether either of the bumpers had any pre-existing damage; etc. As a result, Dr. Bain's testimony as to the

---

[87] *See, e.g., Brown v. Miska*, No. Civ.A. V-94-067, 1995 WL 723156, at *4–5 (citations omitted) ("Without any account of Cox's intermediate reasoning or methodology, the validity of that reasoning cannot be tested. If a methodology cannot be falsified, refuted, or tested by any objective means, then it is incapable of meeting the 'validity' criterion of *Daubert* because it can never be subjected to the scrutiny that any 'valid' methodology must survive.").

[88] *See, e.g., Martinez v. Offshore Specialty Fabricators, Inc.*, No. 08-4224, 2011 WL 820313, at *2 (E.D. La. Mar. 2, 2011).

[89] FED. R. EVID. 702.

velocities of the vehicles involved in the crash and the load or force experience by Robert Parker is excluded.

Finally, based upon his opinions regarding the velocities of the vehicles and the forces generated, Dr. Bain expressed his opinion that the load experienced by Robert Parker must have been less than 250 pounds. Dr. Bain's opinion that Robert Parker experienced loads of less than 250 pounds in the crash is premised upon his opinion regarding the velocities of the vehicles involved in the crash.  This testimony has been excluded by the Court as unreliable. As a result, Dr. Bain's testimony regarding the load experienced by Parker also is excluded under Federal Rule of Evidence 702 and *Daubert.*

As support for his conclusion for the load experienced by Robert Parker in the crash, Dr. Bain relies on the following research article: Richards, et al., *Incidence of Thoracic and Lumbar Spine Injuries in Restrained Occupants in Frontal Collisions* (2006).[90] According to Dr. Bain, the authors ("Richards") found that "compressive lumbar loads in frontal crashes for delta-Vs less than 15 mph are typically less than 250 lbs."[91]  The Court notes that the Richards article is an evaluation of the "incidence and potential injury mechanisms underlying thoracic and lumbar spine fractures in moderate frontal impacts."[92] The authors found that "thoracolumbar spinal injuries are rare when an occupant is restrained by a lap and shoulder belt, and are often accompanied by abdominal injury. The spinal loads measured during frontal impacts with restrained and nominally positioned ATDs were found to be well within injury thresholds."[93] The Richards article does not provide adequate support for Dr. Bain's opinions regarding force.

---

[90] R. Doc. 70-2 at 10.
[91] R. Doc. 70-2 at 10.
[92] R. Doc. 94-2 at 1.
[93] R. Doc. 94-2 at 1–2.

2. _Medical Causation Analysis_

In his expert report, Dr. Bain also expressed opinions with respect to the medical cause of Robert Parker's injuries. Dr. Bain's chief conclusion is that Robert Parker's lower-back injuries could not have been caused by the rear-end collision but, instead, are a product of pre-existing injuries.[94] Dr. Bain's medical-causation analysis is based on his analysis of the collision, the forces and loads that resulted, how those forces and loads impacted Robert Parker's person, and whether Parker's injuries resulted therefrom. Dr. Bain did not speak to the Plaintiff nor to his treating physician or the doctor who did an examination of the Plaintiff at the request of the Defendants.[95]

    a. Qualifications

The Court first examines whether Dr. Bain is qualified to testify as a biomechanical expert as to the medical cause of Robert Parker's injuries. Dr. Bain has a doctorate of medicine from Queens University in Kingston, Ontario, and maintains medical licenses in Canada and the State of Texas. He no longer actively treats patients and has not since 2003.[96] When Dr. Bain did treat patients, he did so as a general practitioner in family and emergency medicine, not as a specialist in neck, back, or spine injuries.[97] As mentioned previously, Dr. Bain also has an undergraduate degree in nuclear engineering from the Royal Military College in Kingston, Ontario. Dr. Bain does not have a degree in biomechanical engineering. Furthermore, Dr. Bain is not a licensed engineer and has never worked as an engineer. Dr. Bain has taken a limited number of courses in accident reconstruction and obtained a certification from the Accreditation Commission for Traffic Accident Reconstruction (ACTAR). There has been no showing that these accident-

---

[94] R. Doc. 70-2 at 12.
[95] R. Doc. 70-1 at 6-7.
[96] R. Doc. 70-7 at 2; R. Doc. 70-8 at 2–3.
[97] R. Doc. 70-8 at 2–3.

reconstruction courses have any relevance to Dr. Bain's qualifications to express these opinions.

In *Oaks v. Westfield Insurance Co.*, a court in this district excluded Dr. Richard Harding, a purported biomechanical expert.[98] It appears Dr. Harding is a former member of Biodynamic Research Corporation, the firm with which Dr. Bain is affiliated. In *Oaks*, Dr. Harding intended to testify with respect to both "biomechanics and medical causation by opining that the force of impact could not have caused Plaintiff's injuries."[99] The court excluded Dr. Harding, in part, on the basis that he was not qualified to testify with respect to issues of medical causation:

> Dr. Harding is not qualified to testify about Plaintiff's medical condition because he is not board certified or certified in any medical specialty, he has not practiced clinical medicine in over a decade, and he has never been licensed to practice medicine in the United States. Although he was at one time licensed to practice medicine in the United Kingdom, he has since lost his license due to inactivity.[100]

A review of Dr. Bain's curriculum vitae and professional qualifications reveals that, like Dr. Harding, Dr. Bain is not board certified or certified in any medical specialty and has not practiced clinical medicine in approximately 13 years.[101] Although Dr. Bain maintains medical licenses in Canada and the State of Texas, those licenses alone do not render him qualified to testify as an expert on issues of medical causation. The Court finds that the Defendants have not carried their burden of establishing by a preponderance of the evidence that Dr. Bain is qualified to testify as a biomechanical expert with respect to the medical cause of Robert Parker's injuries and, for this reason alone, excludes his opinon as to medical causation. Out of an abundance of caution, the Court also will

---

[98] *Oaks v. Westfield Ins. Co.*, No. 13-1637, 2014 WL 198161 (E.D. La. Jan. 16, 2014).
[99] *Id.* at *2.
[100] *Id.*
[101] *See* R. Doc. 70-8.

determine whether Dr. Bain's opinion with respect to medical causation is the product of reliable principles and methods.

### b.  Reliable Principles & Methods and Sufficient Facts & Data

Dr. Bain expressed his medical causation opinion that (1) Parker's "lumbar spine did not undergo any significant bending or loading,"[102] (2) Parker did not suffer a disc herniation or protrusion,[103] and (3) Parker's "low back was subjected to forces that would not cause injury."[104] He further opines that Parker "may have been startled by the event and experienced some reflexive muscle strains," and also that "[a]ny symptoms that Mr. Parker had would have abated within days without medical treatment."[105] Finally, Dr. Bain expressed his opinion that "[a]ny diagnoses, and subsequent investigations and treatments related to DDD, are not causally related to the subject event."[106]

First, Dr. Bain's medical causation determination is premised upon his opinion that Robert Parker experienced loads of less than 250 pounds in the crash.  This opinion, in turn, is premised upon his findings regarding the velocities of the vehicles and the loads resulting from the crash.  Dr. Bain's testimony with respect to the velocities of the vehicles and the loads experienced by Robert Parker as a result of the crash both have been excluded as unreliable under Federal Rule of Evidence 702 and *Daubert.*  Any opinions he would express based on these inadmissible conclusions likewise are excluded as unreliable under Federal Rule of Evidence 702 and *Daubert.*

Second, Dr. Bain's medical causation opinion must be excluded because it is not based upon sufficient facts or data. Even Dr. Bain admits that Robert Parker "may have

---

[102] R. Doc. 70-2 at 10.
[103] R. Doc. 70-2
[104] R. Doc. 70-2 at 12.
[105] R. Doc. 70-2 at 10.
[106] R. Doc. 70-2 at 12.

been startled by the event," which might have an impact on the forces he experienced in the crash, but he failed to take this into account when formulating his opinions. Instead, Dr. Bain made a number of assumptions with respect to Robert Parker's posture in the driver's seat, whether Parker's seatbelt locked upon impact, the type and quality of seats in Parker's vehicle, and the position of Parker's headrest.[107] For example, Dr. Bain concluded in his report that Parker's seatbelt locked upon impact and "would have prevented any rebound of his trunk" and "constrained his ramping up the seatback."[108] Dr. Bain admitted in his deposition, however, that he was unsure whether Parker's seatbelt locked but, instead, was only assuming that it did based on his experience.[109] Dr. Bain also admitted in his deposition that he did not know whether Parker had both hands on the steering wheel at the time of the crash or whether he was sitting up straight or leaning to one side at the time of impact.[110]

With respect to the headrest in Parker's vehicle, Dr. Bain concluded in his report that the "headrest would likely have contacted the back of [Parker's] head," which "provides an alternate load path to accelerate his head forward and decreases neck forces as well as limits neck motion."[111] In his deposition, however, Dr. Bain conceded he had no proof that the headrest contacted the back of Parker's head.[112] In fact, Dr. Bain noted that, by Parker's own admission, his head never came into contact with the headrest, which, if true, indicates that the collision was a "lower acceleration event" than what he calculated.[113]

---

[107] *See generally* R. Docs. 70-1, 70-2.
[108] R. Doc. 70-2 at 9.
[109] R. Doc. 70-1 at 10.
[110] R. Doc. 70-1 at 9.
[111] R. Doc. 70-2 at 9.
[112] R. Doc. 70-1 at 11.
[113] R. Doc. 70-1 at 11.

With respect to Parker's seatback, Dr. Bain concluded in his report that "there was very little differential movement between Mr. Parker's thorax and lumbar spine as a result of the support provided by his seatback."[114] Dr. Bain further concluded that the "horizontal accelerations that [Robert Parker] was subjected to (peak vehicle acceleration less than 6 g) have been shown not to injury any spinal structure as long as the spine is supported by a device such as the seatback and headrest that Mr. Parker had."[115] Dr. Bain was questioned in his deposition with respect to the type of seats in Parker's vehicle and the level of support provided by his seatback, but Dr. Bain was unable to provide any specifics. Dr. Bain explained that Parker's seatback provided "excellent support" because it "didn't fail" and he "didn't collapse into the rear of the seat."[116] Dr. Bain explained that he "got an exemplar vehicle and put someone the same height and weight as Mr. Parker into the vehicle."[117] He then looked at "the geometry of that seat" and examined how someone of Mr. Parker's size fit in the seat.[118] Dr. Bain did not inspect Mr. Parker's Hyundai, so he was unsure if the seat in the exemplar vehicle was substantially the same as the seat in Mr. Parker's vehicle. Dr. Bain defended his analysis, saying: "But even if it has a different seat or headrest than the exemplar surrogate vehicle that I used, my opinions aren't going to change. He had an excellent seat in that vehicle."[119] Of note, the article on which Dr. Bain relied for his conclusion that Robert Parker's seatback provided ample support was written in 1959, over 50 years before Mr. Parker's Hyundai and the seats therein were manufactured.

---

[114] R. Doc. 70-2 at 9.
[115] R. Doc. 70-2 at 9.
[116] R. Doc. 70-1 at 14.
[117] R. Doc. 70-1 at 12.
[118] R. Doc. 70-1 at 12.
[119] R. Doc. 70-1 at 17–18.

In *Breaud v. Werner Enterprises, Inc.*, a court in the Middle District of Louisiana excluded Dr. Bain as an expert, in part, because there were "several instances where he lacked relevant facts and data to reach his opinions" and "he reached his conclusions by making assumptions or using unreliable data."[120] In *Breaud*, a low-impact rear-end collision case similar to this one, the court found that Dr. Bain's opinions were based on insufficient facts and data because he did not visit the accident scene, take measurements, or collect data, nor was he able to conclude that certain dents on the vehicles were or were not caused by the subject collision.[121] In the present case, Dr. Bain's opinions suffer from similar flaws. In his deposition, Dr. Bain admitted that he assumed underlying facts. For example, he made assumptions with respect to Robert Parker's posture in the driver's seat, whether Parker's seatbelt locked upon impact, the type and quality of seats in Parker's vehicle, and the position of Parker's headrest. Although questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility, the expert's opinion must be based on sufficient facts or data such that the opinion is reliable.[122] In this case, Defendants have not met their burden of establishing by a preponderance of the evidence that Dr. Bain's opinions are based on sufficient facts or data, such that his opinions are reliable.  This serves as another reason as another reason for Dr. Bain's medical causation opinions.[123]

---

[120] *Breaud v. Werner Enters., Inc.*, No. 03-860-JJB-SCR (M.D. La. Mar. 20, 2006).

[121] *Id.*

[122] *See, e.g., Sigur v. Emerson Process Mgmt.*, No. Civ.A. 05-1323-A-M2, 2007 WL 1893632, at *3 (M.D. La. Apr. 25, 2007).

[123] The Court notes that Dr. Bain has been excluded on similar grounds, having been prohibited from testifying with respect to both biomechanical and medical-causation opinions, by state and federal courts across the country. *See, e.g., Godchaux v. Peerless Ins. Co.*, 2013-1083 (La. App. 3 Cir. 06/04/2014), 140 So. 3d 817; *Lascola v. Schindler Elevator Corp.*, No. 08-4802, 2010 WL 971792 (E.D. La. Mar. 12, 2010); *Breaud v. Werner Enters., Inc.*, No. 03-860-JJB-SCR (M.D. La. Mar. 20, 2006); *Johnny v. Bornowsky*, No. 10-04008-CV-W-FJG, 2011 WL 3794082 (W.D. Mo. Aug. 24, 2011); *Salvatore v. Pingel*, No. 08-cv-00312-BNB-KMT (D. Colo. Apr. 6, 2009); *Cockrell v. Levesque*, No. 2006-CI-14200 (Tex. Dist. Ct. Apr. 16, 2008); *Johnston v. Laidlaw Transit, Inc.*, No. 2005/1104 (N.Y. Sup. Ct. Jan. 29, 2008); *Peltier v. Wright*, No. A498416 (Nev. Cir. Ct. July 30, 2007); *Smith v. Thompson*, No. 2006-CI-02299 (Tex. Dist. Ct. July 16,

## II.     <u>Dr. David Barczyk</u>

Defendants filed two motions *in limine* to exclude the proposed testimony of Dr. David Barczyk, a purported biomechanical expert retained by Plaintiffs. First, Defendants argue Dr. Barczyk should be precluded from testifying because Plaintiffs did not identify him as a retained expert or disclose his report timely.[124] Second, Defendants argue that, even if the Court concludes that Dr. Barczyk's report was timely disclosed, Dr. Barczyk should be excluded under Federal Rule of Evidence 702 and *Daubert*.[125]

According to Plaintiffs, Dr. Barczyk is a rebuttal expert under Federal Rule of Civil Procedure 26(a)(2)(D)(ii). Plaintiffs wish to call Dr. Barczyk for the sole purpose of rebutting the testimony of the Defendants' biomechanical expert, Dr. Charles Bain.[126] Even if Dr. Barczyk is a proper rebuttal expert under Rule 26(a)(2)(D)(ii), an issue on which the Court does not take a position, the Court has excluded Dr. Bain as an expert under Rule 702 and *Daubert*, rendering any need to rebut Dr. Bain's testimony moot.

Dr. Barczyk is precluded from testifying as an expert in this case.[127]

---

2007); *Ballew v. Jones*, No. 2004-05274 (Tex. Dist. Ct. Feb. 28, 2007); *Tout v. Zsiros,* No. 1438/2005 (N.Y. Sup. Ct. Feb. 5, 2007); *Jones v. Lewis*, No. 2004-798 (N.Y. Sup. Ct. Nov. 9, 2006); *Stanton v. Fulton*, No. 04-11656 (Fla. Cir. Ct. May 15, 2006); *Thomas v. Reed*, No. 027-J-1510 (Mo. Cir. Ct. Feb. 14, 2006); *Percival v. Matson*, No. 04-3576 (Fla. Cir. Ct. Apr. 2, 2005). Some courts have permitted Dr. Bain to testify on a limited basis. *See, e.g., Chavez v. Marten Transport, Ltd.*, No. 10-0004 MV/RLP, 2012 WL 988011 (D.N.M. Mar. 22, 2012); *White v. Great West Cas. Co.*, No. 08-1491, 2009 WL 2747795 (W.D. La. Aug. 25, 2009); *Eubanks v. Cottrell, Inc.*, No. 05-CV-1361 JCH, 2007 WL 172566 (E.D. Mo. Jan. 19, 2007); *Sport v. Continental Western Ins. Co.*, No. 04-1386-KMH, 2006 WL 618271 (D. Kan. Mar. 10, 2006).

[124] R. Doc. 46.

[125] R. Doc. 65.

[126] R. Doc. 48 at 1.

[127] In light of this finding, the Court need not address whether Dr. Barczyk's proposed testimony satisfies Rule 702 and *Daubert*.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Plaintiffs' motion *in limine* to exclude Dr. Charles "Ted" Bain is **GRANTED**, and Dr. Bain is hereby excluded from testifying as an expert in this case.[128]

**IT IS FURTHER ORDERED** that Defendants' motion *in limine* to exclude Dr. David Barczyk on timeliness grounds is **DENIED AS MOOT**.[129]

**IT IS FURTHER ORDERED** that Defendants' motion *in limine* to exclude Dr. Barczyk under Federal Rule of Evidence 702 and *Daubert* is **DENIED AS MOOT**.[130]

**New Orleans, Louisiana, this 23rd day of June, 2016.**[131]

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[128] R. Doc. 64.

[129] R. Doc. 46.

[130] R. Doc. 65.

[131] The undersigned is neither an engineer nor a scientist. Nevertheless, the Court must perform its gatekeeper function under *Daubert*. In this case, that task was performed with little help from Dr. Bain's report, his deposition, or Defendants' counsel. The Court is confident she correctly evaluated Dr. Bain's qualifications, as well as the reliability of his opinions.